[No. 1,967.]

## THE PEOPLE OF THE STATE OF CALIFORNIA ex rel. PLUMAS COUNTY v. R. C. CHAMBERS, W. A. BOLINGER, F. B. WHITING, SAMUEL GOODWIN, W. C. FAIRCHILD, P. D. SHAW, N. C. CUNNINGHAM, C. O. BOLINGER, C. F. KAULBACH, AUSTIN CHAMBERS, CREED HAYMOND, M. TRANOR, AND J. D. GOODWIN.

RAILROAD INCORPORATION—PAYMENT OF "TEN PER CENT" BY CHECK NOT SUFFICIENT.—Under the Act of May 20th, 1861, providing for the incorporation of railroad companies (Stats. 1861, p. 607), and requiring at least one thousand dollars per mile to be subscribed, and ten per cent thereof, in cash, to be actually and in good faith paid in before incorporation. *Held*, that payment of such ten per cent could not be made in a check on a bank, drawn by a person who had not on deposit funds sufficient to meet it, even though it appeared that such check would have been paid if presented.

PAYMENT OF "TEN PER CENT" A CONDITION PRECEDENT TO INCORPORATION OF RAILROAD COMPANY.—The provision of section one of the Act for the incorporation of railroad companies (Stats. 1861, p. 607), requiring payment of ten per cent of the amount subscribed *in cash*, is not merely directory; it is a condition precedent, without which the subscribers to a company have no power to incorporate.

CAL. REPS. XLII—26

QUO WARRANTO AGAINST CORPORATION.—Where Bolinger and Chambers, the chief subscribers of the " Oroville and Virginia City Railroad Company," paid in the ten per cent of their subscriptions, required by law to be paid in cash, in a check drawn by Bolinger on the Bank of California, and it appeared that Bolinger had no funds there, but that the check would have been paid if presented; *held*, that such payment was not a payment in cash, as required by law, and that the incorporation, under such circumstances, was invalid, and should be so declared on quo warranto.

APPEAL from the District Court of the Second Judicial District, Plumas County.

The facts, so far as they are material to the decision, are stated in the opinion; but it may be added that the action was instituted professedly for the purpose of relieving the County of Plumas from the operation of the Act of March 30th, 1868, known as the Bond Act (Stats. 1867–8, p. 630). The decision in the Court below having been adverse, the plaintiff appealed.

*Van Clief & Gear*, for Appellant.

In order to secure title to a corporate franchise, under a general law, each and every condition prescribed by the Legislature, as precedent to the grant, must be substantially complied with, and the non-performance of any one condition, no matter what it may be, will prevent the title from vesting as against the State, without reference to the good or bad faith of the omission. (*Harris* v. *McGregor*, 29 Cal. 127; *Mokelumne Hill Mining Co.* v. *Woodbury*, 14 Cal. 424; *Carlisle* v. *Cahawba and Marion R. R. Co.*, 4 Ala. 70; *Field* v. *Cooks*, 16 La. An. 154; *Williams* v. *Franklin Tp. Acad. Association*, 26 Ind. 316; *Becht* v. *Harris*, 4 Minn. 504; *Atlantic and Ohio R. R. Co.* v. *Sullivant*, 5 Ohio State, 279; *Ferraria* v. *Vancelles*, 23 Ill. 459; *Walker* v. *Devereux*, 4 Paige Ch. 229; *Valk* v. *Crandall*, 1 Sand. Ch. 179; *Commonwealth* v. *Central Passenger Railway*, 52 Penn. State, 512; *People* v. *King*, 23 Wend. 193.)

The payment, *in cash*, of the ten per cent of the capital stock subscribed, supposing there ever was any valid subscription, was a condition precedent to incorporation. Such payment could not be made in check. An exact compliance with the statute in regard to the payment of the percentage, in order to acquire title to a corporate franchise of this kind, was necessary. No substitute, however equivalent or bona fide it might be, would satisfy the statutory requirement for money, or v st any right thereunder as against the State. (*Eaton* v. *Aspinwall*, 19 N. Y. 119; *People* v. *Troy House Co.*, 44 Barb. 634; *Haviland* v. *Chace*, 39 Barb. 283; *Taggart* v. *Western Maryland R. R. Co.*, 24 Md. 588; *People* v. *Rensselaer Ins. Co.*, 38 Barb. 323; *Patterson* v. *Arnold*, 45 Penn. State, 415.)

The case of *Commonwealth* v. *Westchester Railroad Company*, 3 Grant, 200, relied upon on the other side, is not applicable, because the corporation there was organized under a special Act of the Legislature, differing in its provisions from our scatute. But whatever it may hold, the later case of *Patterson* v. *Arnold*, above cited, from the same State, supports our position.

*Haymond & Stratton*, for Respondents.

It is made a point of objection to the organization of the company, that ten per cent on the amount subscribed was not all paid in cash; but that part of it was paid in a check drawn by Bolinger on the Bank of California. If we are correct in our views as to the findings, this point cannot be raised on the record; for in neither the assignment of errors attached to the statement on appeal nor in the specifications of error attached to the statement on motion for new trial is this point suggested as one upon which the appellant will rely. But be this as it may, there is nothing in the point. Section four of the general railroad Act of New York requires every subscriber, at the time of subscribing, to pay

ten per cent on the amount subscribed by him, in money, and goes farther than the railroad Act of this State, for it in express terms forbids any subscriptions to be received or taken, without such payment. But it was expressly held that a check, or sight draft on a banker, is a good payment in money under the section cited. (*Beach* v. *Smith*, 28 Barb. 261.) The term "cash" payment, in the statute, must be construed according to its common acceptation in the every-day transactions of the business world. Such is the construction given it in the above cited case of *Beach* v. *Smith*, and it satisfies the spirit and accords with the reason of the statutory rule.

By the Court, Crockett, J.:

This is an action of quo warranto against the defendants, claiming to compose the "Oroville and Virginia City Railroad Company," in which the defendants are charged with usurping the functions of a railroad company, without having been duly and properly incorporated as such. The answer sets up the several acts which were performed by the corporators to effect an organization under the general corporation Act of this State, and avers that the statute was complied with, and the company duly organized. Judgment was entered for the defendants, and the plaintiff appeals, both from the judgment and from the order denying a motion for new trial.

Written findings were filed, which were excepted to by the plaintiff as defective; but the exceptions were overruled, to which ruling the plaintiff excepted. This ruling is assigned as error on the appeal from the judgment; and it is further claimed that the judgment is inconsistent with the findings as they were made. The last point will be first considered.

The findings are certainly obnoxious to the objection (so

repeatedly adverted to by this Court), that the findings of fact and conclusions of law are not separately and distinctly stated. Nevertheless, the facts intended to be found can be sufficiently eviscerated from the mere argument and inferences of the Court to render it apparent what facts were considered proved. Amongst other facts the Court finds that before the certificate of incorporation was signed, ten per cent of the amount previously subscribed "was paid in in cash and bankable checks." In a subsequent portion of the findings the particular manner in which this payment was made is thus explained: "The sum of ten thousand nine hundred dollars was paid by Bolinger for himself and Chambers (being the ten per cent upon the stock subscribed by them), by check drawn upon the Bank of California. The good faith of Chambers is shown by the evidence that in a short time after gold bullion was paid by him to Bolinger for his moiety of that check. The evidence of Bolinger shows that he had, prior to March 27th, 1867, a large bank account with the Bank of California; that oftentimes he overdrew his account, under arrangements with the bank, the bank charging him a certain interest on the overdrawn day's balance. Other witnesses testified that his checks upon the Bank of California had been taken by them as cash, and cash paid for them, and had never been dishonored. Bolinger says he could not now tell what the status of his account was at the bank at the time he drew this check; whether the balance then was two thousand dollars or three thousand dollars for him or against; but says absolutely and positively, that the check would have been cashed on presentation. That it never was presented, amounts to nothing. It, as all other checks drawn upon responsible parties in good faith and with money in the hands of the drawee to meet them, was only a representative of that much money, was paid by the subscribers and received by the company as money, was used by the company as cash assets, and the

company could have received the money upon it any time it had been demanded. It was, then, an actual payment of money, and in good faith."

It further appears from the findings that ten per cent of the whole amount subscribed amounted to the sum of eleven thousand dollars, of which ten thousand nine hundred dollars was paid in the above named check. It is obvious that the Court intended to find as facts:

*First*—That the check would have been paid on presentation, whether Bolinger had funds on deposit to meet it or not.

*Second*—That the company received it as cash, but never presented it for payment.

*Third*—That when the check was drawn, Bolinger had not to his credit in bank sufficient funds to meet it.

*Fourth*—That the check was paid to and received by the company in good faith as cash.

Assuming these to have been the facts, the question for consideration is whether the delivery of the check was a compliance with the first section of the Act of May 20th, 1861, providing for the incorporation of railroad companies. (Stats. 1861, p. 607.)

That section requires, as a preliminary to the organization of the company, that stock to the amount of at least one thousand dollars per mile of the proposed road shall be subscribed " and ten per cent in cash so required to be subscribed shall be actually and in good faith paid to a Treasurer to be named and appointed by said subscribers from among their number."

We are not called upon, in this case, to decide whether or not a payment of the ten per cent in good faith by checks payable *in presenti*, and drawn against a sufficient sum on deposit to meet them, would be a compliance with this requirement of the statute, and particularly if the checks were presented and paid within a reasonable time. That is

not this case; and the question here presented is whether the payment can be made in a check drawn by a person who had not on deposit sufficient funds to meet it, and which was never presented for payment, even though it be conceded that the check would have been paid had it been presented. If payment in this method can be substituted for the *cash* payment required by the statute, it is obvious that payment in a promissory note, payable on demand, and which would have been paid on presentation, but which was never presented for payment, or in any negotiable securities, which might at any time have been converted into cash, but were not so converted, would have been equally as valid as the method here adopted. Nothing was, in fact, paid by Bolinger, unless his personal liability as a drawer of the check can be considered payment; for it was not proved, as appears from the findings, that he had any funds to his credit in bank of which the check could operate as an assignment; and it would have been purely at the option of the bank whether it would have paid the check or not. If it had refused, it could not have been coerced to pay it. It was under no legal obligation to pay it, and the case stands precisely as if Bolinger had made his promissory note to the company upon an understanding between him and the bank that, as a matter of favor and accommodation to him, the bank would pay the note on presentation; the note, however, never having been presented for payment.

It is a wholly immaterial circumstance that Bolinger was in good credit, and that his check might, and probably would, have commanded the cash in the vicinity. The same would doubtless have been true of his own, or any promissory note by a responsible maker, or a good mortgage security, or marketable stocks, or any other kind of property which had a current market value. But none of them would have constituted a *cash* payment in the sense of the statute. The policy which dictated this provision is perfectly appa-

rent. It was intended to prevent the formation of corporations for the construction of railroads unless the corporators should testify their good faith and earnestness in the enterprise by subscribing for stock to the amount of one thousand dollars per mile of the proposed road, and actually paying in *cash* ten per cent of the amount subscribed before proceeding to incorporate. It was also intended to furnish some guaranty to those dealing with the company that it was not a mere paper corporation, without any substantial basis. But whatever may have been the motive for this enactment, its language is clear and explicit, and the Courts have no authority to disregard it. It requires ten per cent of the subscription to be paid in *cash;* and a check drawn upon a bank by a person who had no funds to his credit, and which was never presented for payment, can in no just sense be deemed *cash,* however good the credit of the drawer. If the statute had intended to permit the *credit* of the subscriber to be substituted for *cash* it would have said so. But it evidently contemplated nothing of the kind. This objection arises on the face of the findings, and in my opinion is fatal to the alleged act of incorporation. The payment of ten per cent in *cash* was a condition precedent, without the performance of which the subscribers had no power to incorporate. An exact and literal compliance with the statute in this respect may not be indispensable. If from accident, inadvertence, or some other unintentional cause, there should be a failure to pay an insignificant portion of the ten per cent, I presume it would not vitiate the act of incorporation. But there must be a substantial compliance with the statute. In this case the whole amount to be paid was eleven thousand dollars, of which ten thousand nine hundred dollars was paid in Bolinger's check, leaving only one hundred dollars to be paid in cash. This cannot be regarded as a substantial compliance with the statute. Counsel insist, however, that the provision in respect to the prior subscription of stock, and

the payment of the ten per cent, is directory only, and that the payment is not a condition precedent, the performance of which is essential to the validity of the act of incorporation, and in support of this proposition we are referred to the case of *Commonwealth* v. *Westchester Railroad Company*, 3 Grant, Pa. 200.   But that decision was founded on a special statute, in many respects essentially different from ours, and does not sustain the position here contended for.   But if it was directly in point, we would not be inclined to follow it. On the other hand, I think it is apparent that without a substantial compliance with this provision the subscribers acquired no jurisdiction to organize themselves into a corporate body, and this view of the law is supported by the following authorities: *Eaton* v. *Aspinwall*, 19 N. Y. 119; *People* v. *Troy House Company*, 44 Barb. 634; *Haviland* v. *Chase*, 39 Barb. 283; *Taggart* v. *Western Md. Railroad Company*, 24 Md. 588; *People* v. *Rensselear Insurance Company*, 38 Barb. 323; *Patterson* v. *Arnold*, 45 Pa. St. R. 415.

If these views be correct, the act of incorporation is invalid, and the defendants are not entitled to exercise corporate powers.

Judgment reversed and cause remanded, with an order to the District Court to enter judgment for the plaintiff on the findings.

Mr. Justice Temple did not participate in the foregoing decision.